
**Filed**
Supreme Court of Guam, Clerk of Court

# IN THE SUPREME COURT OF GUAM

**PEOPLE OF GUAM,**
Plaintiff-Appellee,

**v.**

**DWAYNE PIYELIT,**
Defendant-Appellant.

Supreme Court Case No.: CRA21-012
Superior Court Case No.: CF0080-19

## OPINION

**Cite as: 2022 Guam 16**

Appeal from the Superior Court of Guam
Argued and submitted on June 2, 2022
Via Zoom video conference

Appearing for Defendant-Appellant:
William Benjamin Pole, *Esq.*
Law Offices of Gumataotao & Pole, P.C.
456 W. O'Brien Dr., Ste. 104
Hagåtña, GU 96910

Appearing for Plaintiff-Appellee:
Grant A. Olan, *Esq.*
Assistant Attorney General
Office of the Attorney General
Prosecution Division
590 S. Marine Corps Dr., Ste. 901
Tamuning, GU 96913

**E-Received**
12/29/2022 2:37:26 PM


BEFORE: F. PHILIP CARBULLIDO, Chief Justice; ROBERT J. TORRES, Associate Justice; and KATHERINE A. MARAMAN, Associate Justice.

**TORRES, J.:**

**[1]** Defendant-Appellant Dwayne Piyelit appeals the sentence he received under a plea agreement, in which Piyelit pleaded guilty to one charge of Third Degree Criminal Sexual Conduct (as a Second Degree Felony). Piyelit was sentenced to six years of incarceration, with credit for time served. On appeal, Piyelit argues: (1) that his due process rights were violated when he could not confront and dispute the factors the trial court used in sentencing; (2) that the trial court's consideration of his cooperation with Plaintiff-Appellee People of Guam ("People") resulted in a sentence of the maximum six years; and (3) that the trial court erred by not considering his individual characteristics during sentencing. For the reasons in this opinion, we affirm the trial court's sentence.

## I. FACTUAL AND PROCEDURAL BACKGROUND

**[2]** On February 26, 2019, an indictment was filed against Defendant-Appellant Dwayne Piyelit and three co-defendants for various crimes involving the alleged sexual assault of a minor, S.K. Piyelit entered into a plea agreement in which he pleaded guilty to Third Degree Criminal Sexual Conduct (as a Second Degree Felony), as a lesser-included offense of the First Charge of First Degree Criminal Sexual Conduct (as a First Degree Felony), in violation of 9 GCA §§ 25.25(a)(3) and (b). The People also secured similar plea agreements from co-defendants Burton Borja and Joleen-Lee Meipel Rankin.

**[3]** Piyelit's plea agreement specified that in exchange for his full and truthful cooperation, including his agreement to submit a written statement and testify against his co-defendants, the

People pledged to argue for a sentence within a range of one to six years of incarceration.

Explicitly, Piyelit's plea agreement provided:

> That as to the offense of **THIRD DEGREE CRIMINAL SEXUAL CONDUCT (As a 2ⁿᵈ Degree Felony), as a lesser-included offense of the First Charge of FIRST DEGREE CRIMINAL SEXUAL CONDUCT (As a 1ˢᵗ Degree Felony)**, the People and Defendant are *free to argue* for a sentence within a range of **one (1) to eight (8) years of incarceration** at the Department of Corrections, Mangilao, with credit for time served. *If the Defendant fully cooperates with the government against his co-actors,* **Vianney Nennis Hosei, Burton Borja, and Joleen-Lee Meipel Rankin**, *by submitting a written statement regarding their involvement and testifying against them at trial, the People will argue for a sentence within a range of one (1) to six (6) years of incarceration . . . .*

Record on Appeal ("RA"), tab 111 at 5 (Plea Agreement, Mar. 2, 2021).

[4]     Piyelit provided written responses to the People's questions and testified at the trial of the only co-defendant to go to trial, Vianney Nennis Hosei.

[5]     After testifying at Hosei's trial, but before sentencing, Piyelit and the People altered one of the listed elements of the crime to which Piyelit pleaded guilty. Under the new agreement, the third element of the charge was changed from "mentally incapacitated" to "physically helpless." RA, tab 185 (Resp. to Order, Aug. 12, 2021). The new plea agreement provided:

> First, the incident occurred on or about the period between November 3rd, 2018 and December 31st, 2018 inclusive in Guam, second, defendant did intentionally engage in sexual penetration with another to wit, fellatio, with [S.K.] . . . . Third, defendant knew or had reason to know that [S.K.] . . . was *physically helpless*.

Transcript ("Tr.") at 5-6 (Change of Plea, Sept. 3, 2021) (emphasis added). The other terms of the plea agreement remained the same.

[6]     Piyelit, Rankin, and Borja all testified against Hosei; however, there was conflicting testimony about what occurred on the night of the incident. Piyelit testified he first met S.K. sometime around October or November 2018 through social media. Piyelit had intended to contact S.K.'s sister but messaged S.K. accidentally. According to Piyelit, on the night of the incident in

November 2018, he posted a "story" on his Facebook and Instagram accounts whereby he made a general invitation for people to attend a party at Borja's house. Tr. at 110 (Jury Trial, Apr. 7, 2021). Piyelit stated that S.K. responded with an interest in attending, and so he, Borja, and another friend picked up S.K. from her house and then stopped to buy beer. Piyelit denied knowing S.K.'s age at the time of the incident; he testified remembering telling the police she was eighteen years old.

[7]     Piyelit testified that everyone consumed alcohol during the party, and during the evening, Borja brought S.A. into his bedroom. Piyelit claimed that he and Hosei carried another friend, who was passed out from drinking, to Borja's room, and walked into Borja and S.K. having sex. Piyelit and Hosei placed their friend on a spare mattress in the bedroom and then "joined in." *Id.* at 119-20.

[8]     Piyelit did not recall whose idea it was to film the incident but maintained the video was filmed on Borja's phone. Piyelit testified that he did not ask for, or receive, verbal consent from S.K., and he could not recall whether S.K. was intoxicated. The People played the recorded video at trial, and Piyelit confirmed he was depicted in the video participating in sexual acts with S.K. Piyelit stated that Borja sent him a copy of the video a few days after the incident. Sometime around December 2018, he discovered the video was being sent to others and asserted Rankin admitted to him she had obtained a copy from his cell phone and sent the video to other people.

[9]     On cross-examination, Piyelit testified that sometime during the party—before the assault and video incident—he and S.K. spent time alone. When his friends asked what happened, Piyelit told them that he had sex with S.K. Piyelit explained he and S.K. did not actually have sex, but he lied to his friends because he wanted to brag.

**[10]**     After the video was filmed, around November or December 2018, Rankin attended a barbecue with Piyelit and S.K. at Borja's house.  Rankin testified that she discovered the video recording of the assault on Piyelit's phone when she was scrolling through the music collection saved on his device.  Rankin sent a copy of the video to herself and attempted to communicate with S.K. about the video on Facebook Messenger.  When S.K. did not respond, Rankin sent a copy of the video to two of S.K.'s friends and one of Rankin's cousins.  Rankin claimed one of S.K.'s friends shared the video in a group chat, and then others received a copy of it and circulated the video over social media.

**[11]**     Borja and S.K. contradicted Piyelit's testimony, offering differing versions of the incident. Borja testified that during the party, he observed Piyelit and S.K. having sex outside of his residence.  Borja stated he and Hosei were jealous that Piyelit had sex with S.K., so he asked Piyelit when it would be "[his] turn" to have sex with her.  *Id.* at 160.  Borja testified Piyelit spoke to S.K. on the side, and then S.K. approached Borja, and they went to his room to have sex.  Borja testified he could not have sex with S.K. because he was too intoxicated, and after he unsuccessfully tried a second time, he unlocked his bedroom door, and Hosei and Piyelit entered.  Borja declared that he, Piyelit, and Hosei had sex with S.K. and that he recorded the video at the direction of Piyelit. Borja testified S.K. never consented to have sex with any of them.  He believed S.K. was too drunk to give consent and described her as "out of it."  *Id.* at 170.

**[12]**     Contrary to Piyelit's account, S.K. testified Piyelit knew she was sixteen years old at the time of the incident, and he invited her to the party on Facebook Messenger.  She testified the other boys were unaware of her age, and Piyelit told her to say she was eighteen years old.  S.K. stated she consumed vodka and Coke at the party—prepared by Piyelit—which made her dizzy and have blurry vision.  S.K. told Piyelit she felt dizzy, and he told her to slow down.  S.K. did not recall

the other events that led to the video, nor did she recall the actions depicted in the video. S.K. stated that about a week after the video began to spread, Piyelit told her what happened in the video was her fault.

[13] The Guam Probation Office prepared a Presentence Investigation ("PSI") Report that recommended Piyelit receive the minimum sentence of one year suspended with credit for time served and supervision by the Probation, rather than Parole, Division. The recommendation was based on several factors, including: Piyelit's age, strong family ties, low recidivism risk, clean criminal record, and because he took responsibility for his actions and expressed remorse.

[14] Piyelit also requested the minimum sentence of one year. Piyelit's request mirrored the PSI Report, with trial counsel highlighting Piyelit's cooperation with the People, his history, and the impact that the "single night of drunken stupidity" had on his physical and emotional health. RA, tab 178 at 2 (Def.'s Sent'g Mem., June 29, 2021). The People requested that Piyelit be sentenced to six years of incarceration, the maximum sentence if Piyelit fully cooperated with the People. The People claimed Piyelit was not informative when they interviewed him and that "Piyelit was more forthcoming to the defense counsel's questions than to the People's questions." RA, tab 179 at 3-4 (People's Sent'g Mem., July 14, 2021). The People juxtaposed Borja's and Piyelit's levels of cooperation and claimed Borja was forthcoming with information while Piyelit was not cooperative. Borja and Piyelit were sentenced to three and six years, respectively. Piyelit timely appealed.

## II. JURISDICTION

[15] This court has jurisdiction to hear appeals from a final judgment of the Superior Court. 48 U.S.C.A. § 1424-1(a)(2) (Westlaw current through Pub. L. 117-248 (2022)); 7 GCA §§ 3107(b), 3108(a) (2005); 8 GCA §§ 130.10, 130.15(a) (2005).

### III.  STANDARD OF REVIEW

**[16]**     This court reviews questions of law *de novo*.  *People v. Rios*, 2008 Guam 22 ¶ 8.  Alleged

due process violations are reviewed *de novo*.  *People v. Diego*, 2013 Guam 15 ¶ 13.  "The issue of

whether the lower court violated the constitutional rule established in *Apprendi v. New Jersey*, 530

U.S. 466 (2000), is a question of law that is reviewed *de novo*."  *People v. Guerrero*, 2017 Guam

4 ¶ 16 (quoting *People v. Quitugua*, 2015 Guam 27 ¶ 32).

**[17]**     However, where a claim of error is not properly preserved, it is instead reviewed under the

plain error standard of review.  *See United States v. Olano*, 507 U.S. 725, 731 (1993); *People v.*

*Chung*, 2004 Guam 2 ¶ 9.  Thus, "[a] claim raised for the first time on appeal that a sentence

violates a defendant-appellant's constitutional rights under *Apprendi v. New Jersey*, 530 U.S. 466

(2000), is reviewed for plain error."  *People v. Belga*, 2016 Guam 1 ¶ 15 (quoting *United States v.*

*Lopez*, 500 F.3d 840, 848 (9th Cir. 2006)).

**[18]**     "Any issues not raised by the defendant at trial or at sentencing are reviewed for plain

error."  *People v. Joshua*, 2015 Guam 32 ¶ 21.  "Plain error is highly prejudicial.  We will not

reverse unless (1) there was an error; (2) the error is clear or obvious under current law; (3) the

error affected substantial rights; and (4) reversal is necessary to prevent a miscarriage of justice or

to maintain the integrity of the judicial process."  *People v. Quitugua*, 2009 Guam 10 ¶ 11.

### IV.  ANALYSIS

**A.  Piyelit's Due Process Rights Were Not Violated During Sentencing**

**[19]**     Piyelit argues the trial court violated his due process rights by relying on evidence and

witness testimony from co-defendant Hosei's trial to determine his sentence, without providing

Piyelit the opportunity to present contrary evidence or cross-examine the witnesses.  Appellant's

Br. at 18-20 (Mar. 2, 2022).  Piyelit also claims the trial court violated *Apprendi v. New Jersey*

when it denied him the opportunity to present mitigating evidence of S.K.'s alcohol consumption on the night of the assault. *Id.* at 20.

### 1. The "invited error" doctrine does not apply

[20]     Without conceding the trial court erred, the People argue this court could invoke the "invited error" doctrine because Piyelit's attorney did not object to the trial court's consideration of evidence obtained during Hosei's trial. Appellee's Br. at 16 (Apr. 20, 2022).

[21]     The invited error doctrine, "precluding appellate review of particular trial errors on grounds of estoppel on grounds of the complaining party's role in causing or inviting the error," prevents a party from urging on appeal "any error arising out of the party's own theory of action or grounds of defense." 5 C.J.S. *Appeal and Error* § 897 (Nov. 2022 Update). This court has recognized that the invited error doctrine may preclude a party from raising certain issues on appeal. *See People v. Ramey*, 2019 Guam 11 ¶ 12. The invited error doctrine applies only to those rights deemed waived, as opposed to merely forfeited. *See United States v. Perez*, 116 F.3d 840, 842 (9th Cir. 1997). Use of the doctrine cannot be based "upon a defendant's silence on an issue; rather, for the doctrine to apply, a defendant 'must affirmatively invite the error.'" *Ramey*, 2019 Guam 11 ¶ 13 (quoting *People v. Finik*, 2017 Guam 21 ¶ 42).

[22]     The People urge the invited error doctrine is appropriate because Piyelit's defense counsel did not articulate any additional objections after Piyelit's sentence was announced. Appellee's Br. at 16. Referencing a portion of Piyelit's sentencing hearing, the People note that "trial counsel specifically told the trial court, after it reviewed its factual findings, that there were no other reasons why Piyelit's sentence should not be imposed." Appellee's Br. at 17-18.

[23]     While the record is clear that Piyelit did not articulate any other challenges to the imposition of the sentence, it is unclear the supposed right Piyelit waived. Piyelit did not

"intentional[ly] relinquish[] or abandon[] . . . a known right" or affirmatively invite any error, and the actions of Piyelit's counsel are distinguishable under this doctrine. *See Olano*, 507 U.S. at 733. Piyelit's silence about the trial court's reliance at sentencing on the testimony from Hosei's trial is indication that Piyelit forfeited, rather than waived, this issue. The invited error doctrine does not apply.

### 2. The Confrontation Clause does not apply to sentencing hearings

[24]    The Sixth Amendment provides a defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. The Confrontation Clause,[1] offering the accused the opportunity "to cross-examine those providing evidence against him at trial," is an evidentiary protection essential to a fair trial and the discovery of truth. *United States v. Powell*, 650 F.3d 388, 391 (4th Cir. 2011). Both federal and state courts have held this Confrontation Clause right does not apply during sentencing. *See, e.g.*, *id.* at 393 ("[I]n holding that the Confrontation Clause does not apply at sentencing, we join every other federal circuit court that hears criminal appeals." (citing federal cases)); *United States v. Martinez*, 413 F.3d 239, 242 (2d Cir. 2005) ("Both the Supreme Court and this Court . . . have consistently held that the right of confrontation does not apply to the sentencing context . . . ."); *State v. Martinez*, 303 P.3d 627, 632 (Idaho Ct. App. 2013) (citing state cases)).

[25]    "A defendant 'does not possess a constitutional right to cross-examine a person who provided the government with information that was later used during sentencing.'" *United States v. Anaya*, 32 F.3d 308, 314 (7th Cir. 1994) (quoting *United States v. Smith*, 3 F.3d 1088, 1100 (7th Cir. 1993)). Rather, due process simply requires a defendant "be sentenced on the basis of reasonably reliable information." *Id.* (quoting *Smith*, 3 F.3d at 1100). Information is deemed

---

[1] The Organic Act of Guam specifically incorporates the Sixth Amendment's Confrontation Clause. *See* 48 U.S.C.A. § 1421b(g), (u).

"'false or unreliable' if it lacks 'some minimal indicium of reliability beyond mere allegation.'" *United States v. Ibarra*, 737 F.2d 825, 827 (9th Cir. 1984) (quoting *United States v. Baylin*, 696 F.2d 1030, 1040 (3d Cir. 1982)).

[26]     Besides the due process right to be sentenced based on accurate information, a defendant also must be given "notice and an opportunity to contest the facts upon which the sentencing authority relies in imposing the sentence." *Torres v. United States*, 140 F.3d 392, 404 (2d Cir. 1998) (citing *Townsend v. Burke*, 334 U.S. 736, 741 (1948)). In *United States v. Notrangelo*, the Ninth Circuit held the trial court did not violate the defendant's due process rights by considering the testimony of witnesses at a co-defendant's trial because the defendant had the opportunity to object to these facts and present supporting evidence at his sentencing hearing. 909 F.2d 363, 365-66 (9th Cir. 1990).

[27]     Piyelit does not claim the information the trial court considered was false or unreliable. He also cites no authorities to support his claim that due process required the trial court to allow him—a non-party at trial—to cross-examine witnesses at Hosei's trial or his sentencing hearing. Further, while the Confrontation Clause would seem to be the most pertinent constitutional provision, it has long been recognized by federal courts and most state courts that the Confrontation Clause applies only at trial. In line with other jurisdictions, we decline to hold the Sixth Amendment Confrontation Clause applies during sentencing hearings.

### 3. Piyelit's due process argument is unsupported

[28]     Before sentencing, Piyelit's defense counsel advocated for a lenient sentence, relying on the argument that Piyelit had fully cooperated with the People. Following the announcement of Piyelit's sentence, the trial court allowed Piyelit's counsel to dispute why the determined sentence should not be issued. Piyelit's counsel did not object. On appeal, Piyelit argues, "Mr. Piyelit was

not given his due process right to counter evidence relied upon by the trial court in giving him the maximum sentence possible." Appellant's Br. at 19. This statement is not supported by the record.

[29]   Piyelit tries to contrast his sentencing hearing to *People v. Castro*, 2013 Guam 20, claiming he was unable to "explain any factors either at his trial or at his sentencing." Appellant's Br. at 20. In *Castro*, when sentencing the defendant, the trial court considered the defendant's background by looking through information provided throughout the jury trial and contemplating letters submitted by family, friends, and Castro himself. 2013 Guam 20 ¶ 63. We determined:

> A sentencing court must be permitted to consider any and all information that reasonably might bear on the proper sentence for a particular defendant. "[H]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics."

*Id.* ¶ 62 (alterations in original) (quoting *Wasman v. United States*, 468 U.S. 559, 564 (1984)).

[30]   Piyelit compares his case to *Woosley v. United States*, 478 F.2d 139 (8th Cir. 1973), and argues the trial court sentenced him without properly considering the facts and circumstances related to the crime he pleaded to. Appellant's Br. at 21. In *Woosley*, the defendant pleaded guilty to refusing induction after he was drafted into the military. 478 F.2d at 140. The judge sentenced the defendant pursuant to his "policy" by which he sentenced all defendants to the maximum five-year prison term for refusing induction. *Id.* at 143. The Eighth Circuit reversed the defendant's "mechanical sentence" because it was devoid of any exercise of discretion; the judge issued a predetermined sentence without considering any mitigating or aggravating circumstances. *Id.* at 143-44.

[31]   Piyelit's use of these cases is unavailing. Comparable to *Notrangelo*, in which the witnesses' testimony was documented in the PSI Report, much of the information cited by the trial court during sentencing—including Piyelit knowing the victim's age and providing her alcohol,

and Piyelit's alleged lack of cooperation—was documented in the PSI Report and alleged in the People's sentencing memorandum, which were submitted before sentencing. *See Notrangelo*, 909 F.2d at 365. Further, similar to the defendant in *Castro*, Piyelit expressed remorse at his sentencing hearing, and the PSI Report included letters from family members that discussed Piyelit's background and pleaded with the judge to issue a lenient sentence. Even so, the *Castro* decision did not hold the sentencing court must assign any weight to the defendant's or others' pleas for leniency. Unlike the formulaic sentence in *Woosley*, the sentencing court here gave "due regard [to] the nature and the circumstances of the crime, the history, character and condition of the offenders," and "considered all the evidence presented along with the presentence investigation." Tr. at 18 (Sent'g, Oct. 14, 2021).

[32]　Piyelit had the opportunity to dispute information in the PSI Report, the People's sentencing memorandum, and the information recited at the sentencing hearing. Piyelit's counsel did not fully avail of the opportunity to challenge the basis of Piyelit's sentence during his hearing.

### 4. The trial court did not violate *Apprendi* or related case law

[33]　Piyelit also claims the trial court's decision to not allow his trial counsel the opportunity to ask S.K. whether he told her to slow down her drinking goes "against the spirit of the holding in *Apprendi v. New Jersey*." Appellant's Br. at 20. We disagree.

[34]　In *Apprendi*, the defendant pleaded guilty to several crimes, and the trial court issued a sentence enhancement, which extended the defendant's sentence beyond the statutory maximum, based on its determination that the defendant had committed a hate crime. 530 U.S. at 469-71. The United States Supreme Court reversed and held, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490.

[35]     Subsequently, in *Blakely v. Washington*, a defendant pleaded guilty to kidnapping, and the judge issued a 90-month sentence after finding the defendant acted with "deliberate cruelty"—which allowed the judge to sentence the defendant outside the standard range.  542 U.S. 296, 296 (2004).  Based on the holding in *Apprendi*, the Court reversed the defendant's conviction because "[t]he facts supporting that finding were neither admitted by petitioner nor found by a jury."  *Id.* at 303.

[36]     The People now advance the same argument that the prosecution asserted in *Blakely*: there was no *Apprendi* error because the sentence Piyelit received was below the maximum sentence allowed under the statute.  Appellee's Br. at 17.  In *Blakely*, the United States Supreme Court rejected this argument and explained, "[T]he relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings."  542 U.S. at 303-04.  Although the People's interpretation of *Apprendi* is incorrect, Piyelit's reliance on *Apprendi* and *Blakely* is, nevertheless, futile.  Unlike these cases, Piyelit's six-year sentence was within the range outlined under the plea agreement.  The trial court did not take it upon itself to make a finding of facts or aggravating factors, which were neither admitted nor stipulated to by Piyelit, to justify a sentencing enhancement.  Further, neither *Apprendi* nor *Blakely* concerned the court's consideration of mitigating evidence.

[37]     The PSI Report referenced S.K.'s testimony that the alcohol made her feel dizzy and that Piyelit told her to slow down her alcohol consumption.  Piyelit's defense counsel also cited this as a mitigating factor in his sentencing memorandum.  The trial court was made aware of this information, and Piyelit does not explain how allowing defense counsel to question S.K. about her testimony would have persuaded the trial court to issue Piyelit a more favorable sentence.  Faulting

the trial court for not allowing defense counsel to question S.K. is an attempt to impose evidentiary procedures for a sentencing hearing more like a trial—without a constitutional basis.

[38]    Piyelit fails to establish the first element of plain error review—that the trial court committed error.  We need not analyze further.

## B.  Piyelit's Substantial Rights Were Not Affected During Sentencing

[39]    Piyelit contends the trial court erred by considering his cooperation with the People and by not properly considering all the facts and circumstances related to the offense or providing him the opportunity to dispute the information the trial court relied on when it issued him the maximum sentence allowable under his plea agreement.

### 1.  Reviewed for plain error

[40]    On appeal, Piyelit does not assert the People breached his plea agreement.  Rather, Piyelit suggests the trial court was precluded from considering his level of cooperation when determining sentencing, and even if this were a valid factor, the trial court erred in finding him less cooperative than co-defendant Borja.  Appellant's Br. at 22-23.

[41]    During sentencing proceedings, Piyelit's counsel requested Piyelit be sentenced to only one year of incarceration, maintaining he had cooperated with the People—likely to try to persuade the trial court to impose a more favorable sentence.  In his sentencing memorandum, counsel urged that Piyelit "unquestionably fully cooperated and the sentencing range should be capped at six years."  RA, tab 178 at 2 (Def.'s Sent'g Mem.).  Upon announcing Piyelit's sentence, the trial court allowed defense counsel to state the reasons Piyelit should not receive the decided sentence.  Yet defense counsel did not contend the court was precluded from considering Piyelit's level of cooperation as an aggravating factor at sentencing.

**[42]**     Because Piyelit raises for the first time on appeal whether the trial court erred in considering his level of cooperation as an aggravating factor and in not considering other facts and circumstances related to the offense, our review is for plain error.  *See Joshua*, 2015 Guam 32 ¶ 21.

### 2.  The trial court articulated sufficient reasons to justify Piyelit's sentence

**[43]**     "A plea agreement is a contract between the Government and the defendant, coming as a result of bargaining between the two parties."  *People v. Camacho*, 2016 Guam 13 ¶ 20.  Thus, "principles of contract law are useful in analyzing plea agreements, even though such principles cannot always be rigidly applied in the criminal law context."  *People v. Faisao*, 2018 Guam 26 ¶ 15 (citing *People v. Mallo*, 2008 Guam 23 ¶ 45).  "We first consider the plain language of the agreement and, if the language is clear, hold the parties to the obvious meaning of the agreement." *Id.*  When determining whether a sentence complies with the terms of a plea agreement, the court must look to what was reasonably understood by the defendant when the plea was entered.  *United States v. Fernandez*, 960 F.2d 771, 772 (9th Cir. 1992) (per curiam).

**[44]**     Piyelit suggests it was improper for the trial court to consider his level of cooperation as an aggravating factor and that the record does not support the trial court's finding that he was less cooperative with the People than Borja.  Appellant's Br. at 22.  Piyelit contends he and Borja were similarly situated, and the sentencing disparity of three years between them was unwarranted.  He claims the trial court failed to consider individual characteristics, such as his youth, which warranted a lesser sentence.  Appellant's Br. at 23-25.

**[45]**     The People disagree and maintain the trial court did not abuse its discretion because there was a "rational basis" for the sentencing disparity between Piyelit and Borja, as Piyelit was "more culpable" than Borja.  Appellee's Br. at 16-17.  The People also emphasize that the terms of

Piyelit's plea agreement required him not just to cooperate but to "fully" cooperate. Appellee's Br. at 18. The People contend Piyelit received the benefit of the cooperation agreement, despite his failure to fully cooperate, because a sentence between one and six years of incarceration was advocated for. Even if the trial court erred in finding that Piyelit failed to fully cooperate, the People suggest the error did not affect his substantial rights and was therefore harmless. Appellee's Br. at 18-20.

[46]     Piyelit's plea agreement states:

> The Attorney General and the Defendant, in consideration for the Defendant's plea of guilty and cooperation, agree to the following:
>
> a. That as to the offense of **THIRD DEGREE CRIMINAL SEXUAL CONDUCT (As a 2nd Degree Felony), as a lesser-included offense of the First Charge of FIRST DEGREE CRIMINAL SEXUAL CONDUCT (As a 1st Degree Felony)**, the People and Defendant are *free to argue* for a sentence within a range of **one (1) to eight (8) years of incarceration** at the Department of Corrections, Mangilao, with credit for time served. *If the Defendant fully cooperates with the government against his co-actors, **Vianney Nennis Hosei, Burton Borja, and Joleen-Lee Meipel Rankin**, by submitting a written statement regarding their involvement and testifying against them at trial, the People will argue for a sentence within a range of one (1) to six (6) years of incarceration . . . .*

RA, tab 111 at 5 (Plea Agreement).

[47]     In analyzing Piyelit's agreement, it is evident the plea created conditions precedent whereby Piyelit had to fully cooperate with the People by providing a written statement and testifying against his co-defendants in exchange for the People arguing for a range of one to six years of incarceration. Based on the plain language of the plea agreement, when Piyelit provided written answers to the People's emailed questions and testified at co-defendant Hosei's trial, Piyelit fulfilled his end of the bargain. He "fully cooperated" under the terms of the plea agreement by submitting a written statement regarding the involvement of Hosei, Borja, and Rankin and testifying against them at trial.

**[48]**     During sentencing, the People argued Piyelit did not fully cooperate because he was not forthcoming with information.  But the plea agreement describes full cooperation as Piyelit submitting a written statement about his co-defendant's involvement and testifying against them at trial.  These conditions were fulfilled by Piyelit.  If the People wanted more than a statement and testimony from Piyelit, additional conditions could have been incorporated in the plea agreement.  The People did not do this.  Based on the contract principles under which we analyze the agreement, Piyelit complied with his end of the bargain, and the People must abide by the arrangement.

**[49]**     Even though the court erred in considering Piyelit's cooperation, this error was harmless. Under the third prong of plain error review—whether the error affected the appellant's substantial rights—the appellant has the burden of proving the error was prejudicial.  *See Quitugua*, 2009 Guam 10 ¶ 31 ("[I]n the absence of evidence in the record to show the defendant was prejudiced, the government will prevail.").  The trial court cited several factors when determining Piyelit's sentence, including (1) Piyelit providing the victim alcohol despite knowing her age, (2) filming and directing parts of the video, and (3) blaming S.K. afterwards.  Further, Piyelit's sentence was within the one-to-six-year bargained-for range.  Because of the court's reliance on these additional factors, and because Piyelit was sentenced within the guidelines of the plea agreement for his full cooperation, Piyelit cannot satisfy the prejudice requirement.

**[50]**     Despite erring by considering Piyelit's cooperation, the court's reliance on additional factors during sentencing and the fact that the sentence was within the bargained-for range makes this error harmless and warrants affirming the trial court's sentencing determination.

//

//

### 3. The trial court did not err in issuing Piyelit a longer sentence than Borja

[51]     The sentencing recommendation in a PSI Report is not binding on the trial court. *See State v. Headley*, 926 N.W.2d 545, 552 (Iowa 2019). And "[t]here is no constitutional requirement that identical punishment be meted out for like crimes." *People v. Diaz*, 2007 Guam 3 ¶ 67 (quoting *Jackson v. United States*, 338 F. Supp. 7, 15-16 (D.N.J. 1971)). "[T]he imposition of sentences within the statutory limits lies almost entirely within the discretion of the trial judge." *Id.* (quoting *United States v. Stull*, 743 F.2d 439, 448 (6th Cir. 1984)).

[52]     It is also within the trial court's discretion to impose disparate sentences upon co-defendants. *Castro*, 2013 Guam 20 ¶ 58 n.6 (quoting *Diaz*, 2007 Guam 3 ¶ 67); *United States v. Endicott*, 803 F.2d 506, 510 (9th Cir. 1986). During sentencing, the trial court "is not required to take into account all factors that may be considered relevant." *People v. Damian*, 2016 Guam 8 ¶ 23. Rather, absent an infringement of a defendant's constitutional right to stand trial, a judge need not explain the basis for dissimilar sentences, within statutory limits, imposed on similarly situated co-defendants. *Endicott*, 803 F.2d at 510.

[53]     In *People v. Diaz*, the defendant argued the trial court punished him by issuing a longer sentence because he exercised his right to a trial rather than pleaded guilty. 2007 Guam 3 ¶ 59. The defendant cited three other cases in which the same trial court judge issued significantly shorter sentences to defendants who pleaded guilty. *Id.* In rejecting the defendant's argument, this court noted the trial court "articulated numerous reasons for imposing the sentence," including several aggravating factors. *Id.* ¶ 68. Comparable to *Diaz*, here, the trial court articulated several reasons to explain the basis of Piyelit's sentence. During sentencing, the judge expressed:

> Mr. Piyelit, I find that your particular actions during the incident were disturbing. You knew the victim. You knew her age. You provided alcohol to her despite her age. You led others at the party to believe you had sex with her. You jumped in

> on the action when she and Mr. Borja were having sex. You gave your phone to film the incident. You directed parts of the video. You blamed her afterwards.

Tr. at 21 (Sent'g, Oct. 14, 2021). These reasons, articulated during sentencing, seem to underscore why Piyelit received a longer sentence than Borja.

[54]    Piyelit also argues that the trial court "seemed to [weigh] a heavier factor against" him for being "indirectly responsible" for spreading the video, while his co-defendants who were "directly responsible" for spreading the video received lesser sentences. Appellant's Br. at 17. This claim is unpersuasive as, arguably, Piyelit initiated the events that led to the assault and to the dissemination of the video. Had Piyelit not invited S.K. to the party, provided her—a minor— with alcohol, and directed Borja to film the incident, perhaps neither the assault nor the video documenting it would have occurred.

[55]    Piyelit argues that the trial court ignored the factors in the PSI Report which favored a lower sentence than the one he received. The PSI Report is meant to assist the trial court in crafting the defendant's sentence; its recommendation is non-binding. Piyelit cites no authority to suggest the trial court had to defer to the PSI Report or articulate specific reasons for departing from the Report's recommendation.

[56]    Finally, Piyelit cites *Roper v. Simmons*, 543 U.S. 551 (2005), to highlight the consideration of juvenile defendants' susceptibility to peer pressure, immaturity, and a lack of understanding of responsibility as mitigating factors at sentencing. Appellant's Br. at 24-25. In *Roper*, the United States Supreme Court held the Eighth and Fourteenth Amendments forbid capital punishment for offenders who were under eighteen years old when their crimes were committed. 543 U.S. at 578. This portion of *Roper* that Piyelit relies on is in the context of the Court explaining why juveniles should be precluded from capital punishment. *Id.* at 569-70. The Court did not hold—as Piyelit implies—that these factors must be considered when sentencing juvenile defendants. Though,

even if the Court made such a holding, it would not matter because Piyelit was eighteen years old when the assault happened.

## V.  CONCLUSION

**[57]**     The Superior Court did not commit plain error in considering the testimony of other witnesses during Piyelit's sentencing hearing.  The sentencing hearing complied with due process, as Piyelit could counter evidence contained in the PSI Report and the other mitigating factors the trial court considered in determining the sentence.  The trial court erred in considering Piyelit's level of cooperation as a factor during sentencing; however, the trial court articulated additional reasoning to justify Piyelit's sentence, and Piyelit received a sentence within the bargained-for range in his plea agreement.  Thus, the error was harmless, and Piyelit's substantial rights were not affected.  We **AFFIRM**.


|                    /s/                     |                    /s/                     |
| :----------------------------------------: | :----------------------------------------: |
| ROBERT J. TORRES                           | KATHERINE A. MARAMAN                        |
| Associate Justice                          | Associate Justice                           |


                    /s/
              F. PHILIP CARBULLIDO
                 Chief Justice